# IN THE COURT OF APPEALS OF IOWA

No. 19-1326
Filing January 21, 2021


**MADISON COUNTY COALITION FOR SCENIC PRESERVATION LLC d/b/a RESIDENT RIGHTS COALITION OF MADISON COUNTY,**
      Plaintiff-Appellant,

**vs.**

**ZONING BOARD OF ADJUSTMENT OF MADISON COUNTY, IOWA,**
      Defendant-Appellee,

and

**MIDAMERICAN ENERGY COMPANY,**
      Intervenor-Appellee.
_____

Appeal from the Iowa District Court for Madison County, Bradley McCall, Judge.

A coalition of landowners challenges the district court's review on certiorari annulling the writ of the challengers and finding the county zoning board of adjustment did not act outside its power or illegally when it granted an energy company's request for approval to complete a wind turbine project in the county. **AFFIRMED.**

Thomas S. Reavely of Whitfield & Eddy, P.L.C., Des Moines, for appellant Madison County Coalition for Scenic Preservation LLC.

Andrew T. Schoonhoven and Matthew D. Schultz, Winterset, for appellee Zoning Board of Adjustment of Madison County.

Brant M. Leonard, Bret A. Dublinske, and Kristy Dahl Rogers of Fredrikson & Byron, P.A., Des Moines, for appellee MidAmerican Energy Company.

Channing L. Dutton of Lawyer, Lawyer, Dutton & Drake, L.L.P., West Des Moines, and Michael B. Gerrard of Arnold & Porter Kaye Scholer, L.L.P., New York, New York, for amici curiae Citizens for Agricultural Rights and Renewable Energy, Judy Neal, and Steve Neal.

Heard by Bower, C.J., and Vaitheswaran and Greer, JJ.

**GREER, Judge.**

MidAmerican Energy Company (MidAmerican) sought and obtained permission from the Zoning Board of Adjustment of Madison County, Iowa (the Board) to build a wind farm with fifty-two wind turbines in Madison County.[1] Madison County Coalition for Scenic Preservation LLC, which does business as Resident Rights Coalition of Madison County (the Coalition), is a group of individuals who own real estate in Madison County and who oppose the wind farm. The Coalition petitioned for writ of certiorari challenging the Board's approval of the wind farm, alleging the Board's approval violated provisions of the Madison County Zoning Ordinance (the Ordinance) and was therefore illegal.[2] Following a remand to the Board for expanded findings of facts and conclusions of law, the district court concluded the Board erred in its interpretation of the Ordinance, which led the Board to approve MidAmerican's request on more grounds than necessary. While the Board erred, the district court found that because the Board's approval of the wind farm included the appropriate grounds and those grounds were supported by substantial evidence, the Board did not act illegally. The district court annulled the Coalition's writ.

The Coalition appeals the district court's ruling. It challenges the court's interpretation of the Ordinance and the court's conclusions regarding what the Board understood it was being asked to do and what actions the Board took. Additionally, the Coalition maintains there was not substantial evidence in the

---

[1] MidAmerican is involved with several wind-farm projects throughout Iowa and calls the one here "Arbor Hill Wind Project."

[2] The writ named only the Board, but MidAmerican was permitted to intervene in the matter upon its request.

record to make the necessary findings to approve a conditional use permit and, even if there were, the findings the Board did make were not legally sufficient. Finally, the Coalition challenges the adequacy of the notices.

MidAmerican and the Board ask that we affirm the ruling of the district court. Citizens for Agricultural Rights and Renewable Energy,[3] Judy Neal, and Steve Neal jointly received permission from our supreme court to file an amici curiae brief in support of the Board's approval of the wind farm. They also urge us to affirm the district court's ruling.

**I. Background Facts and Proceedings.**

On February 2, 2018, MidAmerican filed an "application for variance" and a "special use permit & zoning certificate application" in Madison County with the goal of "be[ing] allowed to install up to fifty-two (52) wind turbines with a total height of up to 494 feet." With these applications, MidAmerican also filed a summary explaining the intended project. Within that summary, MidAmerican noted, "The [v]ariance application for the Project seeks Madison County authorization to exceed the height restrictions contained in Section 9, C of the Madison County Ordinance." It also concluded, "MidAmerican believes that the Arbor Hill Project . . . satisfies all of the conditions and requirements as set forth in Zoning Ordinance (including section 14F(a) and section 17(d) and (e)) to allow the Board of Adjustment to . . . issue the special use permit and variance for this Project."

---

[3] Citizens for Agricultural Rights and Renewable Energy is a community group made up of more than sixty residents of Madison County who support wind-energy development. Some members have signed easement agreements with MidAmerican and would receive economic compensation if the wind-farm project moved forward.

The Board held a public hearing on MidAmerican's request in early April. The relevant portion of the public hearing began with a written report presented by the Environmental Health and Zoning Administrator, C.J. Nicholl. The report notes that section 6(2)(a) of the zoning ordinance provides that "[n]o building or other structure" can "be erected" to "exceed the height" allowed by the ordinance. In agricultural district zones, as MidAmerican looked to construct in, section 9(C) limits the height of buildings to "two, and one-half (2 1/2) stories or thirty-five (35) feet in height except as provided in Section 14." Section 14 of the ordinance is titled "Exceptions, Modifications, Interpretations and Conditional Uses." The staff's report cited section 14(C)(1), which provides:

> C. The building height limitations of this Ordinance shall be modified as follows:
> 1. Chimneys, cooling towers, elevator bulkheads, fire towers, grain elevators, monuments, penthouses, stacks, silos, tanks, water towers, ornamental towers and spires, radio or television tower or necessary mechanical appurtenances may be erected to a height approved by the Board of Adjustment.

Additionally, the report referenced section 14(E)(12), which states:

> E. The development and administration of a comprehensive zoning ordinance is based upon the division of the County into zoning districts with uniform regulations defining permitted uses of land and structures within each district. It is recognized, however, that there are occasions when in addition to the principal permitted uses, conditional uses may be allowed after careful consideration of the impact of the particular uses upon the neighborhood and public facilities therein. The following uses may be authorized by a conditional use permit granted by the Board of Adjustment. . . .
> . . . .
> 12. Any structure or land used by public or private utility service company or corporation for public utility purpose, including sewage lagoons, or for purposes of public communication may be permitted in any district. The basis for such permit shall be public convenience.

The report also outlined various conditions the staff believed should be placed on MidAmerican if the Board approved the project, as allowed by section 14(F)(b)—conditions applicable to all special use permits—and how the proposed project met all of the necessary conditions to grant a special use permit as required under section 14(F)(a).[4]  The staff's report, as presented at the public hearing, was silent

---

[4] Section 14(F) provides:

**F. General Requirements and Conditions Applicable to All Special Use Permits.**

In granting any special use permit, the Board of Adjustment may prescribe such restrictions and conditions with respect to the permitted use as the Board deems reasonable to further the objectives of this Ordinance.  The following general requirements are applicable to all special use permits that may be granted by the Board:

a. Required Findings.  No special use permit shall be granted by the Board of Adjustment unless the Board first finds that all of the following conditions exist.

1. Surrounding Area.  The value and qualities of the area (or neighborhood) surrounding the conditional use are not substantially injured, and the establishment of a special use will not impede the normal and orderly development and improvement of surrounding undeveloped property for uses predominant in the area.  In reviewing and acting upon each application for a special use permit, the Board shall each give due consideration to the proximity of the proposed use to public parks, schools, licensed day care facilities, dwellings and residential districts.

ii. Infrastructure.  Adequate utilities, access roads, drainage, and other necessary facilities have been or are being provided.

iii. Intent of Ordinance.  The special use is consistent with the intent and purpose of this Ordinance to promote public health, safety, and general welfare.

iv. Nuisance Factors.  Adequate measures have been or will be taken to prevent or control offensive odor, fumes, dust, noise, and vibration, so that none of these will constitute a nuisance and to control lighted signs and other lights in such a manner that no disturbance to neighboring properties will result.

v. Comprehensive Plan.  The special use is not inconsistent with the comprehensive plan and land use policies of the County.

vi. Cumulative Impact.  The Board shall make a determination that the proposed use would not cause a significant adverse cumulative impact when considered together with other uses

as to the elements required to show unnecessary hardship in order to receive a use variance under section 17(D)(1)(c).[5] Following nearly three hours of public

previously permitted by special use permit. While the impact of a single use permitted by conditional use permit may be deemed acceptable by the Board, the location of more than one conditional use in close proximity to another conditional use may have the potential of causing a significant adverse cumulative impact in the neighborhood.

b. Conditions on Use. In granting any special use permit, the Board of Adjustment may set minimum requirements, and/or specify conditions and restrictions on the proposed use.

[5] Section 17(D)(1)(c) states:

***D. Jurisdiction and Powers of the Board of Adjustment.***

1. The Board of Adjustment shall have the following powers and duties.

. . . .

c. To grant a variance from the terms of this Ordinance when a property owner can show that his property was acquired in good faith and where by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or where by reason of exceptional topographical conditions of other extraordinary or exceptional situation, the strict application of the terms of this Ordinance actually prohibits the use of his property in a manner reasonably similar to that of other property in the same district, and where the Board is satisfied under the evidence before it that a literal enforcement of the provisions of this Ordinance would result in unnecessary hardship, and so that the spirit of this Ordinance shall be observed and substantial justice done. To establish unnecessary hardship, a property owner must show all of the following elements:

i. The land in question cannot yield a reasonable return from any use permitted by the regulations of the district in which the land is located. Failure to yield a reasonable return may only be shown by proof that the owner has been deprived of all beneficial or productive use of the land in question. It is not sufficient merely to show that the value of the land has been depreciate [sic] by the regulations or that a variance would permit the owner to maintain a more profitable use; and

ii. The plight of the owner is due to unique circumstances not of the owner's own making, which unique circumstances must relate specifically to the land in question and not to general conditions in the neighborhood; and

iii. The use to be authorized by the variance will not alter the essential character of the locality of the land in question.

comment on MidAmerican's request, the Board voted to table judgment on the request for ninety days.

The public hearing on MidAmerican's request resumed on July 3, 2018. Chairperson Randy Gamble opened the meeting by stating:

> The applicants request approval to erect up to 52 wind energy conservation systems in sections of Penn, Madison and Jackson townships, each to a height of 494 feet.
> As required by [s]ection 6(2)(a), [s]ections 14(c)(1), 14(e)(12), and 14(e)(13),[6] of the Madison County zoning ordinance, a special use permit and variance granted by the Madison County Board of Adjustments is required for each wind generator in this request.

The Board then heard nearly three more hours of public comments on the request. After the public hearing was closed, Board member Mary Terry moved to "deny the request for variance." The motion was seconded. Board member Terry then stated the reasons she would deny MidAmerican's request, relying on section 17(D)(1)(c) elements for necessary hardship. She stated:

> So the variance was given and requested based on the fact that there is a limitation on height, and they want to build something that is higher than this height.
> And the rules say that in order for us to grant a variance, that there has to—first of all, that the land in question cannot yield a reasonable return—this is reading from the law—that the land in question has to yield a reasonable return from any use—cannot yield a reasonable return from any use permitted by the regulations of the district in which this is located.
> Nobody even addressed that.
> So as far as I know, you can still farm. Without the windmill, you're still allowed the suggested use or the permitted use of that land, which is farming.
> "Failure to yield a reasonable return may only be shown by proof that the owner has been deprived of all beneficial or productive use of the land in question."
> Nobody has shown us that—who wants to put up one of these windmills—that they're deprived of other uses.

---

[6] Section 14(E) lists conditional uses, and paragraph (13) states, "Transmitting stations may be permitted only in 'A,' 'C,' and 'M' Districts."

So you haven't met the test.

Even if I wanted to, and I might want to, I can't, because you haven't met that.

The other thing that it says, that "the plight has to be due to unique circumstances not of the owner's own making." In other words, something has to be going on that you can't be using the land for which it's intended.

That's not demonstrated.

Board member Mandy Nelson agreed with Board member Terry, relying on the section regarding a request for a variance.

Administrator Nicholl then addressed the Board, stating, "So if you look, there's a section that grants the Board of Adjustment the authority to issue variances to the height that's approved by the Board of Adjustment." Nicholl agreed he was referencing section 14C and then said,

But the application of the ordinance would be, "This is what you can't do unless it's otherwise stated in the ordinance."

And it clearly states in the ordinance that those things are allowed with the approval of the board of adjustment to a height that you approve. Otherwise we couldn't put cell towers up.

When Board member Nelson noted wind turbines are not included in the list of structures of section 14(C)(1), there was discussion that "necessary mechanical appurtenances" are on the list. Administrator Nicholl then added—incorrectly— that the section said, "and any other use that is interpreted by the zoning administrator, be it a similar or like use." After more discussion among the Board members, Board member Nelson read from a pamphlet describing the powers of a board of adjustment and noted they were currently dealing with "the authority to grant variances." She then read part of the pamphlet into the record, reading, "A variance is exactly that. The Board of Adjustment operates as a landowner or developer to vary from the express regulations of the zoning ordinance, because

enforcing the provisions of the ordinance would cause extraordinary hardship on that person." Board members Nelson and Terry then voted to "deny the request for the variance" while the other three Board members voted to deny the motion.

After three Board members voted against her motion to deny the variance, Board member Terry asked her co-members:

> I would like to know why—given what the law says, why you are in support of granting the variance.
> I mean, on what are you basing your ability to grant the variance? Where in the law does it say we can grant the variance?
> What are you hanging it on?
> I mean, if the law says you have to show that there's no harm, we've clearly demonstrated harm. And that alone says you can't do it. So what are you hanging it on?
> For the record, how are you granting this variance?
> Give me the code, the section, that you're granting it on. And if you can't, you need to table it.

Eventually, Chairperson Gamble responded, "You know, I think there was some farmers in here the previous meeting that was demonstrating hardship." And Board member Nelson added, "There was one gentleman that spoke that said if you put the wind turbine on his property, then he would be able to put his kids through college." Chairperson Gamble continued:

> I'll tell you my interpretation I got from them.
> MidAmerican has produced people, PhDs, compiled data, and gave us information.
> Respectfully, to everybody else that has talked about the hardships and the things that are hard on them that you're hearing—and I agree with—but, you know, there's things that we all consider hardships, but a hardship to one person may not be to another person, no different than a cell tower, or, you know, the courthouse light that reflects or some other building that maybe I don't like or somebody else doesn't like.
> All things have been met with opposition as we went forward in communities and development and growth. And some of the best things, you know, have been met with that opposition. And all the people and the outcries of hardships, heard duefully [sic] and with

meaning—and I mean no disrespect to them, but it all falls in the gray area of opinion.

Board member Terry then told Chairperson Gamble that he was applying the requirements of section 17(D)(1)(c) "backwards" because "[t]he rule says the person making the variance has to show hardship." Chairperson Gamble responded, "And that falls in your interpretation how that works."

Chairperson Gamble then moved "to approve the variance, to allow the location of 52 wind energy device locations, each up to 494 feet, as required in section 6(2)(a) and section 14(C)(1)." Three members of the Board voted yes. Board member Carrie Larson then moved to issue "a special use permit to allow the location of 52 wind energy device site locations, each up to a height of 494 feet, as required in section 14([E])(12) and 14([E])(13)."[7] Three Board members voted to issue the special use permits. Those same three Board members voted to approve the written findings of facts to support their approval of MidAmerican's request.

In the Board's written ruling, titled the "finding of facts and legal principles upon which the Board acts," sections 6, 9(C), 14(C)(1), 14(E), and17(D) were cited in the ruling. The typed ruling concluded:

---

[7] The oral motion referenced section 14(C)(12) and (13), but those paragraphs do not exist. Based on context and earlier, correct cites in the record, we assume the Board members understood this motion to mean 14(E)(12) and (13). This is supported given that, after a brief recess, chairperson Gamble asked:

> Is there a motion on the Board of Adjustment's finding of facts and legal precedence of Board acts related to the request herein of 52 wind energy conservation systems in sections within Madison and Jackson Townships, each to a height of 494 feet as required by Section 2(a)—6(2)(a), Section 14(C)(1), 14(E)(12) and 14(E)(13) of the Madison County zoning ordinance?

Three members of the Board then voted to approve the findings of facts.

> After careful consideration of all the information that has been presented, and for the factual reasons set forth in the above noted and Section 17 both of which are incorporated by this reference herein, the Board of Adjustment hereby finds:
> The applicant MidAmerican Energy Company Arbor Hill Wind Farm Projects Request for Variance & Special Use Permits has__X__/ has not ___ met the requirements of the Madison County Zoning Ordinance.

Additionally, individual Board members attached signed, handwritten notes to the ruling. Member Larson, who voted to approve MidAmerican's request, underlined language within section 14(E) "Conditional Uses," that stated, "[C]onditional uses may be allowed after careful consideration of the impact of the particular uses upon the neighborhood and public facilities therein." She also circled the term "necessary mechanical appurtenances" within section 14(C)(1),[8] which allows the building-height rule to be modified in specific instances. Board member Larson also underlined section 17D(1)(c)(iii), one of the three elements required for the Board to grant a variance, which states, "The use to be authorized by the variance will not alter the essential character of the locality of the land in question." Board member Larson wrote, "I believe the variances was valid based on the underlined passages. I do not believe that just because 'wind turbine' was not specifically listed, that it automatically disqualifies it. Based on scientific info provided, not anecdotal evidence the variance is approved."

Chairperson Gamble underlined similar language, including language within section 17(D)(2) that discussed what the Board may do "[i]n granting any variance." In addition, he handwrote, "MidAmerican provided data and research from credible

---

[8] In the sheets given the Board members, this was mislabeled as section 14(C)(12).

sources and independent studies. People against provided concerns and statements gathered from independent sources giving me only concern but not documented proof."

Board member Randall Johnson just wrote "I think the regulations have been met."

Board member Nelson, who voted against approving MidAmerican's request, wrote: "I dissent: I disagree with the approval of the Arbor Hill Project. For reasons included in our Madison Co. Zoning Ordinances section 14 and 17. All comments of mine were stated and on the record during our July 3, 2018 meeting."

Board member Terry, who also voted against approval, wrote:

Dissent: Findings of Fact
There was no evidence submitted that an unnecessary hardship exists as required by section 17(D)(1)(C).
There was sufficient evidence submitted that granting the variance would diminish land value, would impair light (flickering) and there was evidence that would impair the general welfare and others use of land (noise, flickering, kids can't play outside, disrupts navigation, prevents enjoyment of rural atmosphere). Under section 17(D)(4) if these elements are demonstrated you must deny variance.

On August 1, 2018, the Coalition petitioned for writ of certiorari in district court. The parties agreed the petition should be granted, and the district court issued a writ of certiorari.

The Coalition alleged the Board's decision to approve MidAmerican's request was illegal in several respects. First, the Coalition alleged that section 14(C)(1) specifically identified "what type of structures" are permitted to be taller than the thirty-five foot limit. They maintained that since "wind turbine" was not one of the listed structures and is not a "necessary mechanical appurtenance[]"

the Board's approval of a variance allowing the wind turbines to be built in excess of thirty-five feet violated section 14(C)(1) and constituted an illegal act. Second, the Coalition noted section 14(F) "sets forth the general requirements that are applicable to all special use permits that may be granted by the Board," but none of the conditions listed in that section were addressed by the Board, making their decision to grant a special permit illegal. Finally, the Coalition cited section 17(D)(1)(c), which lists the three elements that must be proved to establish "unnecessary hardship" and is required for the Board to grant a variance. It maintained these elements were not met, so it was outside the Board's authority to grant a variance.

By agreement of all parties, in November, the district court ordered a limited remand of the case to the Board "for purposes of having the [Board] adopt expanded findings of fact and conclusions of law regarding the approval of [MidAmerican's] application for special use permit and variance related to the Arbor Hill wind project."

The Board's expanded findings of fact were filed in the district court in December. In it, the Board specifically laid out additional sections from the zoning ordinance, including section 14(E)(12), which provides among the list of conditional uses for which the Board can issue special permits, "Any structure or land used by public or private utility service company or corporation for public utility purpose . . . . The basis for such permit shall be public convenience." Noting that the Board reviewed the *applicable* ordinance sections, including section 14(E)(12), the expanded ruling stated:

The Zoning Administrator addressed the Board and reported these types of structures are allowed pursuant to section 14(C)(12)[9] with the approval of the Board and to height also approved by the Board, otherwise cell towers could not have been approved. He stated numerous cell towers have been reviewed and approved by this Board based on his interpretation they are "necessary mechanical appurtenances" and a similar use to those named in Section 14(C)(12). He also interprets a "wind turbine" as a "necessary mechanical appurtenance" and a similar and like use to those listed in Section 14(C)(12) giving the Board the authority to authorize them to a height they approve. (The ordinance contains the following verbiage: *Any use, which is interpreted by the Zoning Administrator to be a similar use to one of the above named uses, and, in his opinion, conforms to the intent of this section*).

After careful consideration of all the information, the Board recognizes that Section 14(C)(12) does not specifically list "wind turbine" or for that matter "cell tower." The Board believes a reasonable interpretation of the ordinance would consider a "wind turbine" and "cell tower" a similar and like use to those listed in Section 14(C)(12) granting the Board the authority to modify the height limitations listed elsewhere in the ordinance and issue the applicant approval for the request. For the factual reasons set forth in the above noted sections of the Madison County Zoning Ordinance, and based upon the testimony, documents and information provided to the Board by the applicant and members of the public, including but not limited to, information regarding the siting of the turbines, noise, shadow flicker, impact to property values, and the overall benefits and detriments of the project which are incorporated by reference herein, the Board of Adjustment hereby finds:

The applicant MidAmerican Energy Company Arbor Hill Wind Farm Projects Request for Variance & Special Use Permits has met the requirements of the Madison County Zoning Ordinance.

---

[9] The Board's expanded written ruling contains a number of typographical errors. First, it lays out what are properly section 14(C)(1) and (2) and labels them 14(C)(12) and (13). Then, throughout its written analysis, it repeatedly references section 14(C)(12). This section does not exist in the Ordinance. And it is unclear to us if the Board meant to reference section 14(C)(1)—which it incorrectly titled section 14(C)(12) one page before—or if it meant to reference section 14(E)(12). At least some references appear to mean section 14(C)(1), based on the use of the language "necessary mechanical appurtenance." But in their pretrial brief to the district court, MidAmerican claimed that the Board was relying on section 14(E)(12).

In a pretrial brief, the Coalition reiterated and expanded upon the arguments it made in its petition for writ of certiorari. MidAmerican responded that no section 17(D)(1)(c) variance was needed. MidAmerican maintained that section 14(E)(12) allowed the Board to approve a conditional use permit for "any structure . . . used by public or private utility service company . . . for public utility purpose." Further, MidAmerican maintained that the combination of section 9(C), which provides that buildings in agricultural districts "shall not exceed . . . thirty-five feet in height, *except as provided in section 14*," and the language of section 14(E)(12) giving the Board authority to approve "*any* structure" for a public utility meant the Board was allowed to approve a structure taller than thirty-five feet under a section 14(E)(12) conditional use permit. (Emphasis added.) Alternatively, MidAmerican asserted the Board's interpretation of the term "necessary mechanical appurtenances" within section 14(C), which lists structures that may be taller than thirty-five feet, to include wind turbines was correct. Finally, MidAmerican argued there was substantial evidence presented to the Board that it could rely on to make the findings required by section 14(F) to properly approve a conditional use permit, and that the findings made by the Board were sufficient to meet the legal standards.

The hearing on the writ of certiorari before the district court took place on April 4, 2019. During the hearing, MidAmerican asserted that it never believed it needed a section 17(D)(1)(c) variance.[10] It implied that the zoning administrator,

---

[10] And it conceded at the hearing that if the court interpreted the Ordinance to require MidAmerican to get a section 17(D)(1)(c) variance, MidAmerican had not presented substantial evidence to support a finding of unnecessary hardship as laid out in the section.

who presented the staff's report on MidAmerican's request to the Board, had just been imprecise with his language and that when he spoke of "variances" he did not mean the use variance provided for in section 17(D)(1)(c). In support of this claim, the Board's attorney correctly noted that the staff report presented to the Board was silent as to section 17(D)(1)(c). MidAmerican suggested that it understood it needed "a height exception, a height approval, or a conditional use permit including height approval." So that when MidAmerican applied for a "variance" to the height limitation in section 9(C), it intended to request a conditional use permit under section 14(E)(12) and, as part of that conditional use permit, approval for their wind turbines to exceed thirty-five feet tall.

At the hearing, the Board's attorney maintained that section 17(D)(1)(c) use variances did not come up until Board member Terry argued to the other Board members that they had to deny the request for a variance because MidAmerican failed to meet the unnecessary hardship requirements. The Board's attorney implied that the fact that Board member Terry made this argument and then three Board members voted against her showed that the Board had a different understanding of the "variance" they were approving. Specifically, the Board's attorney stated:

> In that, the three board members—Board Member Terry discusses 17(D). She's the one who keeps bringing 17(D) up. That was never—from the zoning administrator, was never said: This is something that needs to be considered. But Member Terry believed it was, so she brings it up.
> On at least two votes it's voted down by the other three board members. So to say that the board members had to go in and make some specific finding, the finding's right there for you, Judge. She laid out the reasoning, and they voted no in that area of the record. And it happened twice, I believe, Your Honor, before one of the other board members, and I can't recall which one, did then vote—or did

make a motion to approve, there was a second, and then the three board members do end up voting in favor of it.

. . . .

With the court reporting and the amount of things that were filed, I think the Court could say: Okay, there's an argument, they're making all these substantive arguments why they shouldn't be—why they're not good for the community, et cetera. There's all these other arguments that say they are. Well, those three board members said it's okay, that it fits the ordinance, that it fits, as [zoning administrator] Nicholl had lined out, that they applied 6(2)(a), 9(C), 14(C)(1) and 14(E)(12). That's what was before them. That's what was read into the record. They relied on the zoning administrator. And it says that—and he told them this is what you need to be looking at.

. . . .

And one of the board members relied on 17(D) for their vote against, but 17(D) doesn't apply, in our opinion, and didn't at the time, and it didn't—and the three board members that voted in favor didn't think it applied either, because they voted against it twice.

In June 2019, the district court filed its ruling annulling the writ of certiorari.

It ruled, in part:

[A]fter considering nearly six hours of evidence and argument related to the wind farm application the Board of Adjustment voted three to two to approve the application. It is apparent from the individual comments of the board of adjustment members that there was a misunderstanding as to the distinction between conditional use permits and variances and which rules applied to the request made related to the wind farm.

Comments and notations by two of the three members who voted to approve the application make it clear they considered the wind turbines to be "necessary mechanical appurtenances" within the meaning of the height limit approval provisions. The third member, while not specifically highlighting that portion of his comment sheet, noted the "regulations have been met." The two members who voted against the application, on the other hand, both referred to the more restrictive requirements related to variances contained in Section 17 of the zoning ordinance. It is clear they voted to deny the request because they did not believe these more restrictive requirements had been met.

It is likely this confusion on the part of the board members was caused by the use of the term "variance" on the application submitted, seeking "a variance to Section 9(c) Height Restrictions." It is likely this is the reason, in December 2018, the matter was remanded to the Board of Adjustment to allow entry of expanded findings of fact and legal [principles]. Those amended findings make

it clear the height "variance" was granted pursuant to Section 14 of the ordinance and the standards of review applied to conditional uses and not the standards of review applied to variances pursuant to Section 17 of the ordinance, were used.

The court noted it did "not agree with all of the analysis the Board used"—that "wind turbines fell within the height provisions of the zoning ordinance because they are 'necessary mechanical appurtenances'"—but determined its interpretation of the Ordinance "[led] to the same conclusion." Contrary to the Coalition's argument otherwise,

> The fact that a wind turbine (or a cell phone tower) is not specifically listed in the height provision portion of the ordinance [section 14(C)(1)] does not mean they cannot ever be allowed. Rather, they may be allowed as permitted conditional uses pursuant to Section 14E, not because they are "necessary mechanical appurtenances."

The court concluded:

> While it certainly led to confusion on the part of two of the Board of Adjustment members, the fact the application submitted by MidAmerican Energy was for a "height variance" did not transform the proceeding into a variance application pursuant to the provisions of Section 17D(1)(c). Based on the language of the ordinance, a majority of the Board properly considered the special use permit application and the proposed height of the wind turbines pursuant to the conditional use provisions of Section 14F.

The Coalition appeals.

## II. Standard and Scope of Review.

"A writ of certiorari is limited to triggering review of the acts of an inferior tribunal on the basis the inferior tribunal exceeded its jurisdiction or otherwise acted illegally." *Crowell v. State Pub. Def.*, 845 N.W.2d 676, 682 (Iowa 2014). "Illegality exists when the [board's] findings lack substantial evidentiary support, or when [the Board] has not properly applied the law." *Director of Iowa Dep't of Hum. Servs. v. Iowa Dist. Ct.*, 621 N.W.2d 189, 191 (Iowa 2001) (citation omitted).

Although deference is given to the Board's interpretation of the Ordinance, "final construction and interpretation of zoning ordinances is a question of law for" the court to decide. *Lauridsen v. City of Okoboji Bd. of Adjustment*, 554 N.W.2d 541, 543 (Iowa 1996). "With a certiorari proceeding, the district court finds the facts anew only to determine if there was illegality not appearing in the record made before the [B]oard." *TSB Holdings, L.L.C. v. Bd. of Adjustment for City of Iowa City*, 913 N.W.2d 1, 10 (Iowa 2018). "Fact-findings or issues that were before the [B]oard for decision are 'reviewed under the substantial evidence standard.'" *Id.* (quoting *Bontrager Auto Serv. v. Iowa City Bd. of Adjustment*, 748 N.W.2d 483, 484–85 (Iowa 2008)).

On appeal, our review of the certiorari action before the district court is for correction of errors at law. *Burroughs v. City of Davenport Zoning Bd. of Adjustment*, 912 N.W.2d 473, 478 (Iowa 2018). "We are bound by the district court's findings if supported by substantial evidence." *TSB Holdings*, 913 N.W.2d at 10 (citation omitted). "However, we are not bound by erroneous legal rulings that materially affect the court's decision." *Id.* (citation omitted).

**III. Discussion.**

The Coalition challenges the district court's decision, and ultimately the legality of the Board's approval of MidAmerican's wind-farm project, in a few alternative ways. First, the Coalition argues against the district court's interpretation of the Ordinance. It maintains that, contrary to the district court's ruling, a section 17(D)(1)(c) use variance is required to build a wind turbine more than thirty-five feet tall even if a conditional use permit is approved under section 14(E)(12). Alternatively, the Coalition argues that even if the district court's

interpretation is correct and only a section 14(E)(12) conditional use permit is necessary for MidAmerican to construct the wind turbines, the Board's decision must still be overturned. It argues the Board never approved a conditional use permit under section 14(E)(12) or, even if it did, it failed to make the necessary findings required by section 14(F) before approving the conditional use permit, so any approval under section 14(E)(12) is improper. And finally, the Coalition asserts that if the district court's interpretation is correct and MidAmerican was asking for only a section 14(E)(12) conditional use permit rather than a section 17(D)(1)(c) variance, then the notices sent out about MidAmerican's request and the public hearing were inadequate. We consider each argument in turn.

**A. Interpretation of the Ordinance.**

To begin, we must clear up some terminology issues that have plagued this case since the beginning. The terms "special use" and "conditional use," when applied to permits, generally mean the same thing. Those terms have been and can be used interchangeably. *See City of Okoboji v. Okoboji Barz, Inc.*, 717 N.W.2d 310, 315 (Iowa 2006) ("A special use permit 'allows property to be put to a purpose which the zoning ordinance *conditionally* allows.'" (quoting *Buchholz v. Bd. of Adjustment of Bremer Cnty.,* 199 N.W.2d 73, 75 (Iowa 1972)); *see also* Iowa Code § 414.7 (2018) (allowing the board of adjustment to make special exceptions to ordinances). The Ordinance does this. Section 14(E) lists conditional uses that may be allowed under the Ordinance and describes these as "uses [that] may be authorized by a conditional use permit." While section 14(F), which all parties agree applies to section 14(E), describes what the Board must do to grant a "special use permit."

But a "variance" is neither a special use nor a conditional use. "The purpose of conditional use permits is to provide for flexibility in what otherwise would be the rigidity of zoning ordinances . . . ." *W & G McKinney Farms, L.P. v. Dallas Cnty. Bd. of Adjustment*, 674 N.W.2d 99, 103 (Iowa 2004). In other words, a conditional use is an option under the zoning ordinance so long as the person requesting it can show they meet certain conditions set by the zoning ordinance beforehand. *See id.* at 103–04. In contrast, "[a] variance authorizes a party upon a showing of undue hardship to use his property in a manner forbidden by the zoning ordinance." *Buchholz*, 199 N.W.2d at 75. The requirements one must meet to receive a variance are much more rigorous than those applied to conditional use permits for this reason.

With that in mind, we agree with the district court's interpretation that MidAmerican could have requested a special use permit under section 14(E)(12) to build the nearly 500-foot tall wind turbines without requesting a section 17(D)(1)(c) variance.

Section 14(E)(12) allows the Board to authorize a conditional use permit for "[a]ny structure or land used by public or private utility service company . . . for public utility purpose." Based on the record before us, MidAmerican is a public utility service company and the wind-turbine structures were to be used for public utility purpose.

While section 9(C) generally restricts building heights to two stories or thirty-five feet within agricultural districts, the section states, "[E]xcept as provided in Section 14." On its face, it does not limit itself to section 14(C)(1). Section 14(C)(1) lists specific exceptions to the height rule. But nothing in sections 9(C) or 14(C)(1)

makes this an exclusive list of buildings or structures that can exceed thirty-five feet in agricultural zones. Under section 14(E) and 14(E)(12), the Board may grant a conditional use permit "after careful consideration of the impact of the particular uses upon the neighborhood and public facilities therein" for "*any* structure" used by a public utility company for public utility purposes. (Emphasis added.) We give the term "any" an expansive reading and understand it to mean "all." *See State v. Prybil*, 211 N.W.2d 308, 312 (Iowa 1973) ("The word 'any' . . . is employed to enlarge rather than limit the terms modified. It means 'every' and 'all' . . . ."). "All" structures include those structures taller than thirty-five feet. Our interpretation is bolstered by the fact that section 14(E)(9), which provides for conditional use permits for mobile home parks, specifically provides a height limitation of thirty-five feet for mobile homes and accessory buildings permitted under that section. If the Board never has the power to grant a height exception within its approval of a conditional use permit, why would the height restriction have to be reiterated within section 14(E)(9)? Put another way, there would be no need to restrict the Board's ability to approve mobile homes and accessory buildings over thirty-five feet tall in mobile home parks under the conditional use permit if the Board lacks the power to grant height exceptions as part of its conditional use approval.

For these reasons, we agree with the district court that the Board could have properly granted MidAmerican's request for the wind farm relying on only a conditional use permit under section 14(E)(12).

**B. The Board's Ruling on MidAmerican's Request.**

The next question is whether the Board granted MidAmerican's request based on a conditional use permit under section 14(E)(12) and, if so, whether it

made the required findings within section 14(F)(a) to grant a conditional use permit. The typographical errors in some documents, coupled with the lack of clarity from the zoning administrator about which zoning ordinances applied, created unnecessary confusion over the Board's decision.[11]

The district court cut through the confusion. Of the July 2018 vote, the district court acknowledged, "It is apparent from the individual comments of the board of adjustment members that there was a misunderstanding as to the distinction between conditional use permits and variances and which rules applied to the request made related to the wind farm." And nothing filed by the Board in July suggests that it relied on section 14(E)(12) for its approval, although it did reference conditional uses. We recognize the staff report prepared for and presented to the Board listed section 14(E)(12) (and was silent as to use variances under section 17(D)(1)(c)). But none of the Board members discussed section 14(E)(12) or orally gave it as a reason for their vote. And the Board's "findings of fact and legal principles upon which the Board acts," which laid out three pages of sections from the Ordinance, did not even include section 14(E)(12). None of the written comments by the individual Board members referenced conditional use permits for public utilities.

---

[11] Apparently, in another approved wind turbine project, the zoning administrator required approval under section 14(C)(1) and believed a height variance was necessary, adding to the miscommunication about the project we review here. Generally, a zoning administrator offers a primer on which ordinances apply. Yet, even though it was incorrect to consider section 17 on variances, the administrator never clarified the reasoning to the Board; as a result, the references to the failure to prove a hardship continued throughout these proceedings.

The district court found these errors were corrected with the expanded ruling filed by the Board in December. It concluded, "Those amended findings make it clear the height 'variance' was granted pursuant to Section 14 of the ordinance and the standards of review applied to conditional uses and *not* the standards of review applied to variances pursuant to section 17 of the ordinance, were used." We recognize boards of adjustment, and like tribunals, are by their nature informal, and we do not review their decisions with "technical strictness." *See Thorson v. Bd. of Supervisors*, 90 N.W.2d 730, 735 (Iowa 1958).

We agree that the expanded ruling filed in December moves away from relying on a use variance within section 17(D)(1)(c). The expanded ruling lays out section 14(E)(12) as an applicable section of the Ordinance, but the portion with the Board's reasoning focused on the language from section 14(C)(1) regarding "necessary mechanical appurtenances" and the ability to modify height restrictions (while repeatedly citing to section 14(C)(12), a section that does not exist in the Ordinance). We agree with the district court that section 14(C)(1) does not apply to the wind turbine project.[12] We note that the expanded ruling was drafted by the

---

[12] As our supreme court has said:

> We have previously defined an "appurtenance" broadly as
>> That which belongs to something else; an adjunct; an appendage. Something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or easement to land. . . .
>
> A thing is an appurtenance "when it stands in relation of an incident to a principal and is necessarily connected with the use and enjoyment of the latter." The key factor employed in determining if something is an appurtenance is whether it is "connected in use with the principal."

*State v. Pace*, 602 N.W.2d 764, 770 (Iowa 1999) (alteration in original) (citations omitted). Wind turbines are not appurtenances. Therefore, as the district court

zoning administrator and the county attorney. They requested that the board consider all the portions of that ruling, which it did. Thus, in the end the Board approved the project

> [f]or the factual reasons set forth in the *above noted sections of the Madison County Zoning Ordinance*, and based upon the testimony, documents and information provided to the Board by the applicant and members of the public, including but not limited to, information regarding the siting of the turbines, noise, shadow flicker, impact to property values, and the overall benefits and detriments of the project . . . .

(Emphasis added.) The above noted sections included section 14(E)(12).

In annulling the writ, the district court relied on the fact that "a majority of the [Board] concluded sufficient evidence was presented . . . for the issuance of a special use permit." The district court ruling held that "the Board properly considered the special use permit application and the proposed height of the wind turbines pursuant to the conditional use provisions of section 14F." We agree. We find there is sufficient evidence presented to support the special use permit under one of the applicable sections cited by the Board—section 14(E)(12). Although the Board veered off into solving the administrator's dilemma involving height requirements and referenced non-applicable ordinances, the expanded findings again referenced the conditional use provisions of section 14 that related to public utilities. To phrase it more simply, this Board approved the wind turbines at a height up to 494 feet under a conditional use with specific restrictions under section 14(E) with consideration of section 14(F) factors. *See Bontrager*, 748 N.W.2d at 488-89 (finding failure to mention a specific issue in the findings was not fatal as it

---

concluded, they do not meet the definition of a "necessary mechanical appurtenance."

was clear the board considered the general standards of the special exception and whether those standards were met).

Because the district court found substantial evidence showed that the Board approved the wind turbine project as an appropriate conditional use, we do not disturb that decision. *See TSB Holdings*, 913 N.W.2d at 10 (requiring affirmance if the district court findings are supported by substantial evidence).

**C. Adequacy of Notices.**

Finally, the Coalition raised the adequacy of the notices published and sent by the Board that needed to request a variance. They argue that because the notices were defective, the Board of Adjustment lacked jurisdiction to grant the applications. See *Bowen v. Story Cnty. Bd. of Supervisors*, 209 N.W.2d 569, 572 (Iowa 1973) (stating the rule of error preservation "is applicable where a party assails the tribunal's action as in excess of jurisdiction or illegal"). Although a claim that the court lacks jurisdiction may be raised at any time because it concerns the court's authority to proceed, a claim that the board acted outside the scope of its statutory authority must be made first before that board and then again in the district court to be preserved for appellate review. *See id.* In the end, the variance route proved not appropriate, so any notice requirements necessary to obtain a variance do not apply. But even assuming the Coalition can narrow this argument to one where the Board was without jurisdiction to proceed, we find that claim fails. The Board had express authority to grant special or conditional use permits pursuant to Iowa Code sections 335.10 and 335.15 and could make special exceptions to requirements of the zoning ordinances. *See Martin Marietta Materials, Inc. v. Dallas Cnty.*, 675 N.W.2d 544, 557 (Iowa 2004).

Here, the notices included a request for a special use permit, which is a conditional use, to allow the wind energy devices under the ordinance section 14(E)(12) that the district court ultimately found authorized such use. The notices were adequate.

**IV. Conclusion.**

We affirm the district court decision annulling the writ of certiorari and confirming the Board's authority to grant the conditional use to allow the wind turbines.

**AFFIRMED.**